## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | |
|---|---|
| In re:<br><br>MBLA, LLC and MBMB, LLC,<br><br>*Debtor* | Case No. 23-30455 (AMN)<br>Case No. 23-30456 (AMN)<br>(Jointly Administered Under<br>Case No. 23-30455 (AMN))[1]<br><br>Chapter 11 |
| STORMFIELD CAPITAL<br>FUNDING I, LLC,<br>*Movant*<br>v.<br><br>MBLA, LLC and MBMB, LLC,<br><br>*Respondents* | Re: ECF Nos. 68, 101[2] |

## MEMORANDUM OF DECISION AND ORDER GRANTING MOTION FOR
## RELIEF FROM STAY AND DISAPPROVING DEBTORS' DISCLOSURE STATEMENT

*Appearances*

|  |  |
|---|---|
| *For the Movant:* | Joseph J. Cherico, Esq.<br>McCarter & English, LLP<br>One Canterbury Green<br>201 Broad Street<br>Stamford, CT 06901 |
| *For the Debtor:* | Stuart H. Caplan, Esq.<br>Law Offices of Neil Crane, LLC<br>2679 Whitney Avenue<br>Hamden, CT 06518 |
| *For the U.S. Trustee:* | Steven E. Mackey, Esq.<br>Office of the United States Trustee<br>Giaimo Federal Building, Room 302<br>150 Court Street<br>New Haven, CT 06510 |

---

[1]    The bankruptcy estates are jointly administered but not substantively consolidated.  ECF No. 33.

[2]    "ECF No." means the document number on the court's electronic case filing docket for the case.

## I.    __INTRODUCTION__

The Chapter 11 debtors here—MBLA, LLC ("MBLA") and MBMB, LLC ("MBMB")(together, "Debtors")—propose to reorganize their financial affairs through a Chapter 11 Plan they admit is presently unconfirmable as a matter of law.  ECF No. 124, 02:03:30 to 02:03:36.[3]  The Debtors and their principal, Kenneth W. Hill, propose a reorganization plan they claim will enable them to renovate, lease, and refinance one parcel of real property in New Haven, Connecticut, and then move forward to construct a new residential apartment building on a second parcel.

Stormfield Capital Funding I, LLC ("Stormfield"), the holder of a mortgage debt totaling approximately $4,000,000[4] as of the June 26, 2023 petition date ("Petition Date") is skeptical about the Debtors' Chapter 11 Plan and prefers to go back to state court to complete a foreclosure of the two parcels.  POC 3-1, p. 2.  Stormfield lacks confidence in the Debtors' vision, timetable, and ability to access capital to fund construction and renovation costs.  Stormfield vowed to vote to reject the Chapter 11 Plan's proposed treatment of its claim.[5]

After notice and a hearing to consider the Debtors' First Amended Disclosure Statement ("Disclosure Statement") and after an evidentiary hearing to consider Stormfield's Motion for Relief from Stay ("Motion"), the court is persuaded it is required to grant the Motion and disapprove the Disclosure Statement.  ECF Nos. 68, 101.

---

[3]    All timestamps indicate the hours, minutes, and seconds (00:00:00) in the ".mp3" file publicly available as an attachment (signified by a paperclip) for the referenced PDF document filed in the case docket.

[4]    The foreclosure court found the Debtors owed Stormfield a debt of $4,131,187.32. Stormfield filed a proof of claim stating a debt of $4,295,218.87.  POC 3-1, p. 2.  ECF No. 110, ¶ 31.  For purposes of this decision, the debt may be referred to as being "approximately $4,000,000."

[5]    Neither party addresses 11 U.S.C. § 1111(b) in their argument regarding the confirmability of the Chapter 11 Plan.  Because the court decides it is unconfirmable for other reasons, the intricacies of an § 1111(b) argument which also challenge confirmation of the proposed plan are not addressed.

## II.    <u>JURISDICTION</u>

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. §§ 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(G) (motions to terminate, annul, or modify the automatic stay) and (b)(2)(L) (confirmation of plans).

## III.    <u>APPLICABLE LAW</u>

Chapter 11 of the Bankruptcy Code strikes a balance between two principal interests: facilitating the reorganization and rehabilitation of the debtor as an economically viable entity and protecting creditors' interests by maximizing the value of the bankruptcy estate.  *See generally,* Title 11, United States Code (the "Bankruptcy Code").  When a case presents what is, in essence, a two-party dispute, a bankruptcy court should scrutinize the transaction to determine whether there is a bankruptcy reorganization in prospect or if there is some other bankruptcy-related purpose being served.

### a.  <u>Disclosure Statements and Plans of Reorganization</u>

A Chapter 11 disclosure statement must include adequate information describing the proposed plan in sufficient detail to enable a hypothetical investor of the relevant class to make an informed judgment about the plan.  11 U.S.C. § 1125(a)(1).  A disclosure statement should not be approved if it describes a plan that is incapable of confirmation because it fails to satisfy Bankruptcy Code § 1129.  *In re 3333 Main, LLC,*

2014 WL 2338273, *1 (Bankr. D.Conn. 2014)(AHWS); *In re 18 RVC, LLC*, 485 B.R.

492, 495 (Bankr. E.D.N.Y. 2012); *see also, In re GSC, Inc.*, 453 B.R. 132, 157 n. 27

(Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the

disclosure statement; a disclosure statement that describes a plan patently

unconfirmable on its face should not be approved."); *In re Quigley Co.*, 377 B.R. 110,

115 (Bankr. S.D.N.Y. 2007).

### b. <u>Treatment of Secured Claims in a Chapter 11 Plan; Cramdown</u>

A secured claim is impaired for purposes of considering a Chapter 11 plan if the

claimant's contractual rights are modified or the claimant will not be paid the full value of

its claims under the plan.  11 U.S.C. § 1124.  The Bankruptcy Code permits debtors to

impair a secured claim by making "deferred cash payments" (often referred to as

"cramdown" treatment).  11 U.S.C. § 1129(b)(2)(A)(i)(II).  The deferred payments must

ultimately amount to the full present value of the secured creditor's claims.  To ensure

the creditor receives the full present value of its secured claim, the deferred payments

must carry an appropriate rate of interest.  *Matter of MPM Silicones, L.L.C.*, 874 F.3d

787, 798 (2d Cir. 2017) (*citing Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993)).

To determine an appropriate rate of interest, in cases where there exists an

efficient market, the market rate should apply.  *In re MPM Silicones, L.L.C.*, 874 F.3d at

800.  Where no efficient market exists, the bankruptcy court is expected to employ a

two-step analysis.  *In re MPM Silicones, L.L.C.*, 874 F.3d at 800 (citing *Till v. SCS

Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951 (2004)).  First, the court must determine a

largely risk-free interest rate like the national prime rate.  That rate reflects the financial

market's estimate of the amount a commercial bank should charge a creditworthy

commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default.  The bankruptcy court should then hold a hearing when considering confirmation of a plan to determine a proper plan-specific risk adjustment to that prime rate, at which the debtor and any creditors may present evidence.  Using this approach, courts have generally approved adjustments adding 1% to 3% to the prime rate.  *In re MPM Silicones, L.L.C.*, 874 F.3d at 799.

Bankruptcy Code Section 1129(b) permits a plan proponent to "cramdown" a plan over a dissenting class if the plan does not "discriminate unfairly" and provides "fair and equitable" treatment to the dissenting classes that are impaired under the plan.  *In re 20 Bayard Views, LLC*, 445 B.R. 83, 99 (Bankr. E.D.N.Y. 2011); *In re The Leslie Fay Cos*., 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997).  Before a plan proponent may cramdown a plan, it must establish that all of the other requirements of Section 1129(a) are met.  *In re 20 Bayard Views, LLC*, 445 B.R. at 99.

Plans premised on the sale or refinance of real property that constitutes a debtor's primary or sole significant asset, when the asset has produced little or no revenue prior to the bankruptcy filing, are inherently speculative and invite close judicial scrutiny of the underlying plan's assumptions.  *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 735 (Bankr. E.D.N.Y. 1994).  In determining the feasibility of a Chapter 11 plan, the bankruptcy court must scrutinize the plan carefully.  *In re 8315 Fourth Ave. Corp.*, 172 B.R. at 735.  While a relatively low threshold of proof will satisfy the feasibility requirement for a Chapter 11 plan, the plan's payment terms for the time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its

obligations. *In re 20 Bayard Views, LLC*, 445 B.R. at 100–01 (citing *Dish Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am. Inc.)*, 634 F.3d 79 (2d Cir. 2011)).

### c. Relief from Stay

Here, the movant seeks relief from the automatic stay provided in § 362(a) pursuant to Bankruptcy Code §§ 362(d)(1) and (d)(2):

> On request of a party in interest . . . , the court shall grant relief from the [automatic] stay . . .  --
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization.
>
> 11 U.S.C. § 362(d).

The party requesting relief from stay has the burden of proof on the issue of the debtor's equity in property while the party opposing relief from stay has the burden of proof on all other issues.  11 U.S.C. § 362(g).  Once a movant makes an initial showing of cause, the burden shifts to the debtor on all issues other than the debtor's equity in property. *See, In re Sonnax Indus.*, 907 F.2d 1280, 1285 (2d Cir. 1990).

### i. Cause for Relief from Stay Pursuant to § 362(d)(1)

"Cause" is not defined in the Bankruptcy Code and is decided on a case-by-case basis. *In re Celsius Network LLC*, 642 B.R. 497, 501 (Bankr. S.D.N.Y. 2022).  Cause is often found to include non-payment of a debt or a lack of adequate protection. *U.S. Bank, Nat'l Ass'n v. Conrad (In re Conrad)*, 614 B.R. 20, 25 (Bankr. D. Conn. 2020) (collecting cases).  A bad faith filing may constitute cause. *In re Murray*, 543 B.R. 484, 490 n.31 (Bankr. S.D.N.Y. 2016).  When cause exists, a bankruptcy court is required to grant relief from the stay. *In re Conrad*, 614 B.R. at 25.

1.    <u>Lack of Adequate Protection</u>

A lack of adequate protection supports a finding of "cause" for relief from the stay under Section 362(d)(1).  *In re Conrad*, 614 B.R. at 25.  An entity is entitled to adequate protection as a matter of right, not merely as a matter of discretion.  3 COLLIER ON BANKRUPTCY P 361.02.  The failure to tender post-petition payments, offer post-petition liens on alternate collateral, provide for allowance of administrative expense claims, or otherwise attempt to keep a secured lender from being in a worse position than it occupied on the petition date is evidence of a lack of adequate protection.  11 U.S.C. § 361; *In re Harmony Holding Grp., LLC*, 655 B.R. 849, 857 (Bankr. E.D.N.Y. 2023).

If a debtor can establish a secured creditor's collateral is buffered by an equity cushion, that may constitute adequate protection.  *Wilmington Tr. Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) (collecting cases).  An equity cushion exists if the value of the collateral available to the creditor exceeds the amount of the creditor's claim by a comfortable margin.  3 COLLIER ON BANKRUPTCY P 362.07 (footnote omitted).  Courts look to the present value of the property when assessing whether an equity cushion exists.  *See, e.g., In re O.P. Held, Inc.*, 74 B.R. 777, 782 (Bankr. N.D.N.Y. 1987) (A common method of providing adequate protection is to establish there is an equity cushion, with a debtor able to proffer competent appraisal testimony that the collateral has a present value substantially in excess of the balance due on the allowed secured debt and that the collateral is not rapidly depreciating in value); *accord, Milford Conn. Assocs., L.P. v. Adams (In re Milford Conn. Assocs., L.P.)*, 404 B.R. 699, 704 (D. Conn. 2009) (the present value of the property provided a sufficient equity cushion adequately protect the creditor's secured claim); *cf.  In re*

*Rhoades*, 38 B.R. 63, 67 (Bankr. D.Vt. 1984) (a bare assertion that the future value of the land at plan's end will probably be sufficient to satisfy the mortgage debt is "entitled to little credence").

### 2.   Bad Faith May Constitute Cause

Courts have also found cause for relief from the automatic stay when a bankruptcy petition was filed in bad faith.  Although not expressly stated in section 362(d)(1), it is well established that a debtor's bad faith may constitute cause.  *In re Murray*, 543 B.R. at 490 n.31.  To guide bankruptcy courts in weighing whether a bankruptcy petition was filed in bad faith, the Court of Appeals for the Second Circuit identified eight factors ("*C-TC* Factors"):

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees.
> *In re C-TC 9th Avenue Partnership,* 113 F.3d 1304, 1311 (2d Cir. 1997).

Although the Circuit Court's discussion was in the context of a dismissal, "the standards for bad faith as evidence of cause, whether in the context of dismissal or relief from the stay, are not substantively different from each other."  *In re Amc Realty Corp.*, 270 B.R. 132, 141 (Bankr. S.D.N.Y. 2001) (internal quotation marks omitted); accord, *In re Nattel, LLC,* No. 06-50421, 2007 WL 1489337, at *2 (D. Conn. May 18, 2007).

Lifting the automatic stay is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis. *Froman v. Fein (In re Froman),* 566 B.R. 641, 653 (S.D.N.Y. 2017). Accordingly, the *C-TC* Factors should be weighed to determine "whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended." *Nattel,* WL 1489337 at *2 *(*quoting *in re 68 West 127th Street, LLC,* 285 B.R. 838, 843–844 (Bankr. S.D.N.Y. 2002)).

### ii.  Relief from Stay pursuant to § 362(d)(2)

Pursuant to Bankruptcy Code § 362(d)(2), relief from stay is warranted where the debtor does not have equity in the property and the property is not necessary to an effective reorganization. As noted, the party requesting relief from stay has the burden of proof on the issue of the debtor's equity in property and the party opposing relief from stay has the burden of proof on all other issues. 11 U.S.C. § 362(g). Once a movant shows the debtor lacks equity in the property, the debtor must demonstrate a reasonable possibility of a successful reorganization within a reasonable time and that the subject property is essential to such reorganization.

The United States Supreme Court has interpreted the phrase "effective reorganization" in U.S.C. § 362(d)(2)(B) to require:

> [N]ot merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means . . . there must be "a reasonable possibility of a successful reorganization within a reasonable time."
> *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 375–76 (1988).

The "effective reorganization" requirement requires a showing by a debtor and a determination by the bankruptcy court that a proposed or contemplated plan is not

patently unconfirmable and has a realistic chance of being confirmed. *In re RYYZ, LLC*, 490 B.R. 29, 35-36 (Bankr. E.D.N.Y. 2013); *In re 266 Washington Associates*, 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992).

## IV.    NATURE OF THE PROCEEDINGS

The Debtors are each a limited liability company owned by Mr. Hill as the sole member and manager. ECF No. 107, ¶¶ 6, 12; ECF No. 10-2, p. 1. MBLA owns a residential apartment building known as 201 Winchester Avenue, New Haven, Connecticut ("201 Winchester") located on 0.12 acres of land. ECF No. 10-2, p. 1. MBMB owns a vacant building lot known as 235 Winchester Avenue, New Haven, Connecticut ("235 Winchester") located on 0.16 acres of land (201 Winchester and 235 Winchester together, "Properties"). ECF No. 10-2, p. 2. The Debtors' cases are being jointly administered. ECF No. 33. The Debtors commenced these cases as single asset real estate cases. ECF No. 1. 11; U.S.C. § 101(51B). No relief was sought pursuant to § 362(d)(3) and the special provisions relating to single asset real estate cases are not addressed in this decision.

Stormfield now moves for relief from the automatic stay pursuant to Bankrutpcy Code §§ 362(d)(1) and (2). ECF No. 68. Stormfield argues it has cause for relief from stay pursuant to Bankruptcy Code § 362(d)(1). ECF No. 68, p. 7. Alternatively, Stormfield argues the Properties are not necessary to an effective reorganization pursuant to § 362(d)(2) because the Debtors cannot propose an effective plan of reorganization. ECF No. 68, p. 8.

### a.  The 2019 Bankruptcy Cases

MBLA had an earlier Chapter 11 case which is relevant to understanding the present cases.  On December 2, 2019, MBLA filed a voluntary Chapter 11 bankruptcy petition commencing case number 19-31985 ("2019 Chapter 11 Case").  Case 19-31985, ECF No. 1.  The 2019 Chapter 11 Case stayed a foreclosure action brought by BD Capital, LLC ("debapital") to enforce its mortgage loan on the Properties, with a debt totaling $1,300,000.  *See,* Connecticut Superior Court, Docket No. NNH-CV19-6089031-S, *BD Capital, LLC v. MBLA, LLC, and Kenneth W. Hill.*

MBLA sought to refinance the BD Capital mortgage with a construction loan that would provide liquidity to finish the rehabilitation and renovation of the Properties.  2019 Chapter 11 Case, ECF No. 16, 00:06:40 to 00:09:00.  On February 25, 2020, shortly before the COVID-19 pandemic's full influence was felt, MBLA filed a voluntary motion to dismiss the 2019 Chapter 11 Case because it acquired refinancing and reached an agreement with BD Capital to accept a reduced payoff.  2019 Chapter 11 Case, ECF No. 52.  On March 11, 2020, the court dismissed the 2019 Chapter 11 Case.  2019 Chapter 11 Case, ECF No. 65.

### b.  The 2020 Refinancing

The next day, March 12, 2020, the Debtors closed a construction financing loan with up to $2,700,000 of borrowing availability ("Loan") from Harrison Vickers and Waterman LLC ("Harrison").  ECF No. 106-1.  Mr. Hill guaranteed the Loan in his individual capacity.  ECF No. 106-3.

About a year later, on April 1, 2021, the Debtors defaulted on the Note, when they failed to pay the Loan by the date of maturity.  ECF No. 120, 00:47:15 to 00:48:30.

Shortly thereafter, Harrison sold the Loan to Stormfield.  ECF No. 120, 00:38:00 to 00:47:15.

### c.  The 2021 Foreclosure Action

On August 10, 2021, Stormfield commenced a foreclosure action against the Debtors entitled *Stormfield Capital Funding I, LLC v MBLA, LLC et al.*, Docket No. NNH-CV21-6116303-S ("2021 Foreclosure Action").  On April 10, 2023, the state foreclosure court entered a judgment determining the debt to Stormfield, including attorney's fees and costs, to be $4,131,187.32 ("2023 Foreclosure Judgment").  ECF No. 106-14, p. 41. It also determined that the value of 201 Winchester was $540,000 and the value of 235 Winchester was $100,000.  ECF No. 106-14, p. 41.  The court established a June 26, 2023 first law day[6] ("Foreclosure Law Day").  2021 Foreclosure Action, Doc. ID 125.00. The state court determined the fair market value of 201 Winchester to be $540,000.00 and the fair market value of 235 Winchester to be $100,000.00, a combined total fair market value of $640,000.00.  ECF No 109-19, p. 2.

### d.  The 2023 Bankruptcy Cases

On the June 26, 2023 Foreclosure Law Day, the Debtors commenced these cases, thus staying Stormfield's foreclosure on the Properties.  11 U.S.C. § 362(a); ECF Nos. 106-6, 106-7.  Stormfield claims its debt totals $4,295,218.87 as of the Petition Date.  ECF No. 106-14, p. 2.  Other than proofs of claim filed by Stormfield and Southern Connecticut Gas Company, and the proofs of claim filed by the Debtors in the name of the City of New Haven, no other proof of claim was filed in either case.  All

---

[6]     Connecticut permits judicial strict foreclosure of mortgages.  The first law day is the day appointed for a debtor (as the owner of the equity of redemption) to discharge a mortgage or else forfeit the property to the lender.  BLACK'S LAW DICTIONARY (8th ed. 2004).

unsecured non-priority claims in both cases total less than $5,000, and the Debtors treat those claims as unimpaired in their Disclosure Statement and Chapter 11 Plan.

On December 6, 2023, Stormfield moved for relief from the automatic stay on three grounds. First, Stormfield claims there is "cause" pursuant to Bankruptcy Code § 362(d)(1) due to a lack of adequate protection. Next, Stormfield asserts there is "cause" pursuant to Bankruptcy Code § 362(d)(1) because the Debtors' bankruptcy petition was filed in bad faith. Lastly, Stormfield argues the relief from stay under § 362(d)(2) is appropriate because the Debtors have no equity in the Properties (as Debtors admit) and the Properties are not necessary to an "effective" reorganization.

Seven months after commencing these cases, on February 7, 2024, the Debtors filed the Disclosure Statement and the Chapter 11 Plan ("Plan"). ECF Nos. 106-18, 106-19. The Plan prescribes three phases. ECF No. 106-19, pp. 7 to 13. In Phase 1, six (6) of the twelve (12) apartments on 201 Winchester would be renovated. ECF No. 106-19, p. 11. In Phase 2, the remaining six (6) apartments in 201 Winchester would be renovated. ECF No. 106-19, p. 11. Then, in Phase 3, which would commence upon completion of Phase 2 and payoff to Stormfield, construction would begin at 235 Winchester. ECF No. 106-19, p. 11. The Plan also proposes the Debtors retain sole discretion to prepay Stormfield's claim at any time, in the amount of $2,500,000.

The Plan estimates all six (6) Phase 1 units would be ready for occupancy within nine (9) months after the Plan's effective date. ECF No. 106-19, p. 12. The Debtors reported to their appraiser that the entire project at 201 Winchester could be completed and stabilized by February 1, 2025. ECF 109-28, p. 84. Considering the Plan's

estimated timelines, this would be roughly two (2) months after Phase 1's projected completion if the Plan were confirmed today.

Mr. Hill estimated it would cost approximately $250,000 to $350,000 to complete Phase 1 and about $500,000 and $750,000 to complete all work at 201 Winchester. ECF No. 120, 3:57:40 to 4:00:00; ECF No. 106-18, p. 9; ECF No. 120, 02:52:52 to 02:55:30. Upon fully leasing Phase 1, the Debtors anticipate generating $13,600 in monthly lease revenue. ECF No. 106-19, p. 11. Thirty (30) days after the completion of Phase 1, the Debtors would begin making monthly loan payments to Stormfield. ECF No. 106-19, p. 9. However, the Debtors have failed to demonstrate an adequate source to fund those payments. After completing Phase 2, they predict an additional $15,200 in lease revenue per month. ECF No. 106-19, p. 12. With both Phases 1 and 2 complete and all apartments in 201 Winchester rented, the Debtors expect to generate a total of $28,800 in monthly revenue. ECF No. 106-19, p. 12. ECF No. 106-18.

According to the Debtors, "[f]easibility of the Plan is based on a successful refinance or sale [of the Properties] within twelve (12) months of the completion of Phase 2." ECF No. 106-18. The Plan does not describe the process, timeframe, or funding source for commencing or completing Phase 3. ECF No. 106-18. However, Mr. Hill testified the construction on 235 Winchester would cost over $2,000,000. ECF No. 124, 00:56:00 to 00:57:15. As noted, the Debtors hope to be able to pay $2,500,000 to satisfy the entire $4,295,218.87 debt, an over forty percent (40%) discount. ECF No. 120, 3:28:00 to 3:30:30.

Stormfield vowed to reject and object to the proposed Plan. ECF No. 120, 01:09:00 to 01:09:55. Debtors' counsel admitted the Disclosure Statement should not

be approved and admitted the Plan is presently unconfirmable as a matter of law.  ECF No. 124, 02:07:48 to 02:07:55; 02:03:00 to 02:04:00.

## V.    FINDINGS OF FACT

The court finds the following additional facts, based on the parties' proposed findings of fact filed prior to the evidentiary hearing, the testimony of three witnesses presented on March 5 and March 7, 2024, and the acknowledgments made after the conclusion of the evidence.

### a.  Findings Based Upon the Parties' Proposed Findings of Fact

The court has carefully reviewed each party's respective proposed findings of fact filed as ECF Nos. 107 and 110 on the docket of this case.  Where the parties' statements agree or are otherwise supported in the record, the court assumes the fact as true.  Accordingly, the following facts are adopted by the court for purposes of the hearing on the Motion and the Disclosure Statement.

1. Kenneth W. Hill is the sole member and the manager of the Debtors.  ECF No. 107, ¶ 6.  ECF No. 110, ¶ 8.

2. The Debtors have no employees.  ECF No. 110, ¶ 7.

3. 201 Winchester is 12-unit residential apartment building that is under construction and in need of significant renovations and approvals from the City of New Haven (*i.e.,* certificates of occupancy) before its apartments can be occupied.  ECF No. 110, ¶ 2.

4. 235 Winchester is a vacant lot.  ECF No. 110, ¶ 4.

5. The Properties currently generate no income.  ECF No. 110, ¶ 5.

6. The Debtors executed and delivered a promissory note to Harrison Vickers and Waterman, LLC dated March 12, 2020, in the original principal amount of $2,700,000.00 with a stated maturity date of April 1, 2021.  ECF No. 107, ¶ 18 and 19.  ECF No. 110, ¶ 12.

7. To secure repayment of the Loan, the Debtors executed and delivered to Harrison an Open-End Mortgage Deed and Security Agreement, dated March 12, 2020, recorded against 201 Winchester and 235 Winchester.  ECF No. 107, ¶ 20.  ECF No. 110, ¶ 13.

8. To further secure repayment of the Loan, Mr. Hill executed and delivered to Harrison his individual Guaranty, dated March 12, 2020.  ECF No. 107, ¶ 21.  ECF No. 110, ¶ 14.

9. Stormfield commenced the 2021 Foreclosure Action against the Debtors and Mr. Hill, to enforce its note and mortgage against the Properties.  ECF No. 107, ¶ 26.  ECF No. 110, ¶ 20.

10. A Judgment of Strict Foreclosure was entered in the 2021 Foreclosure Action on April 10, 2023, establishing the first law day as June 26, 2023.  ECF No. 107, ¶ 30.  ECF No. 110, ¶ 24 to 29.

11. The Connecticut Superior Court found the total debt to be $4,131,187.32, comprised of a debt of $4,081,187.32 and attorney's fees of $50,000.00.  ECF No. 107, ¶ 31.  ECF No. 110, ¶ 22.

12. Stormfield's debt totals $4,295,218.87 as of the Petition Date.  Case No. 23-30455, Proof of Claim No. 3-1, Case No. 23-30456, Proof of Claim No. 2-1, ECF No. 106-14, p. 2.

13. Southern Connecticut Gas Company filed a claim in the MBLA case (23-30455) in the amount of $612.94.  Case No. 23-20455, Proof of Claim No. 1-1. ECF No. 110, ¶ 37.

14. Southern Connecticut Gas Company filed a claim in the MBMB case (23-30456) in the amount of $4,061.71.  Case No. 23-20456, Proof of Claim No. 1-1. ECF No. 110, ¶ 38.

15. MBLA filed notice of a claim by the City of New Haven for past due taxes in the amount of $20,918.72.  ECF No. 110, p.14.  Case No. 23-20456, Proof of Claim 4-1; ECF No. 93.

16. MBMB filed notice of a claim by the City of New Haven for past due taxes in the amount of $11,037.19.  ECF No. 110, p. 14.  Case No. 23-20456, Proof of Claim 3-1; ECF No. 43.

17. Other than proofs of claim filed by Stormfield and Southern Connecticut Gas Company, and the proofs of claim filed by the Debtors in the name of the City of New Haven, no other proof of claim was filed in either case.

### b. <u>Facts Presented at Trial</u>

During evidentiary hearings held on March 5 and 7, 2024 regarding the Motion, the court heard testimony from three witnesses: Kenneth W. Hill (the Debtors' principal), Brian T. Royce (an appraiser offering expert testimony regarding the present value of the Properties), and Wesley W. Carpenter (Stormfield's representative).[7]

### i. Testimony by Stormfield's Representative

Mr. Carpenter testified about the purchase of the $2,700,000 Note that forms the basis of the Stormfield claim. The Debtors failed to pay the Note upon its maturity on April 1, 2021, and the default persisted through the Petition Date. ECF No. 120, 00:47:15 to 00:48:30. Stormfield purchased the Loan from Harrison soon after the default. ECF No. 120, 00:38:00 to 00:47:15. Mr. Carpenter also verified there is currently about $293,000 in the escrow account associated with the Loan. ECF No. 120, 01:23:02 to 01:23:15. Mr. Carpenter made clear Stormfield will not support the Debtors' Plan because it lacks specificity, substance, and attention to detail and because the Debtors failed to demonstrate adequate resources to effectuate the Plan. ECF No. 120, 01:09:00 to 01:09:55. During closing argument, Stormfield's counsel reaffirmed that the creditor would oppose confirmation and vote to reject the proposed Chapter 11 Plan. ECF No. 124, 02:17:45 to 02:20:15.

---

[7]    The parties were cautioned at the beginning of the evidentiary hearing that only portions of exhibits as to which a witness had offered testimony would be considered. Debtors' counsel successfully sought to admit lengthy appraisal reports (the appraisals for 201 Winchester and 235 Winchester), and then promptly indicated he had no further questions. After a renewed warning that the court would not parse through the exhibits to determine why they had been offered, questioning resumed. The court notes it has given ECF No. 106-36 – an email sent and received by individuals who were not testifying – no weight.

### ii. Testimony by the Debtors' Principal

Mr. Hill testified on a wide range of facts.  Mr. Hill testified the Debtors' Plan presents an option to pay $2,500,000 in satisfaction of the entire $4,295,218.87 debt, a nearly 40% discount, at the Debtors' option.  ECF No. 120, 3:28:00 to 3:30:30. Regarding work on the Properties, Mr. Hill estimated the cost of completing Phase 1 to be approximately $250,000 to $350,000.  ECF No. 120, 3:57:40 to 4:00:00.  He testified the cost to complete all work at 201 Winchester would fall between $500,000 and $750,000.  ECF No. 120, 02:52:52 to 02:55:30.

Mr. Hill testified he could access funds, perhaps totaling in a range from approximately $870,000 to $1,280,000, to fund Phases 1 and 2, including the following sources of capital:

- $50,000 from Mr. Hill's personal credit cards, ECF No. 124, 00:25:04 to 00:26:16.

- $50,000 in supplier lines of credit through other businesses Mr. Hill owns or is affiliated with, ECF No. 124, 00:25:04 to 00:26:16.

- $70,000 to $80,000 through a personal line of credit.  ECF No. 124, 00:26:37 to 00:26:55.

- $200,000 presently held in an account owned by KW Hill Properties, LLC, owned by Mr. Hill.  ECF No. 124, 00:25:04 to 00:26:16.

- $200,000 to $300,000 in family inheritance from his deceased parents' estate in Louisiana, which he has permission to access.  ECF No. 124, 00:26:55 to 00:28:00.

- $300,000 to $600,000 in a cash contribution when Mr. Hill's wife's building located on Olive Street in New Haven has its own renovations completed, and the building is thereafter refinanced.  ECF No. 124, 00:26:19 to 00:26:37.

Several of these sources of funds are speculative, and the court gives these facts reduced weight.  For example, the court is concerned that despite the $200,000 to

$300,000 inheritance having been available for over ten (10) years, Mr. Hill and his six (6) siblings have only recently agreed to give Mr. Hill access to the funds, and according to Mr. Hill's testimony, the funds or the account they are held in are subject to Louisiana escheat laws with unknown deadlines to retrieving the funds.  ECF No. 124, 00:49:50 to 00:52:42.  Without testimony or other evidence specifying the exact amount of funds, the steps needed to obtain the funds, or a timeframe, the court gives this information little weight.

The court is similarly concerned that the proposed significant cash contribution from Mr. Hill's wife—$300,000 to $600,000—depends upon a number of factors, including the completion of renovations to a residential apartment building at 97 Olive Street, leasing of its apartments, and then a refinance of the building with significant cash out.  Again, no evidence other than Mr. Hill's testimony was provided.  The value of the apartment building before and after completion of the renovations is unknown, the identity of a lender willing to refinance the property is unknown, and the timing is unknown.  While Mr. Hill identified an unsworn letter from his wife as part of the evidence before the court, the letter was not offered into evidence and is not part of the decisional record.  See, ECF No. 124, 00:29:17 to 00:29:50.

### iii.  Testimony by the Debtors' Appraiser

Mr. Royce testified as an expert witness regarding his opinion of the present value of 201 Winchester and 235 Winchester.  According to Mr. Royce, his opinion was that as of January 2024, in their present conditions, 201 Winchester was worth $2,450,000 and 235 Winchester was worth $1,000,000, for a total value of $3,450,000. ECF No. 124, 01:35:00 to 01:36:06.

### iv.  Debtors' Admissions

During closing argument, the Debtor's admitted the Debtors do not have an adequate disclosure statement under 11 U.S.C. § 1125 (ECF No. 124, 02:07:48 to 02:07:55), the Debtors have no equity in the Properties (ECF No. 124, 02:07:00 to 02:05:00), and the Debtors' proposed Chapter 11 Plan is presently unconfirmable as a matter of law (ECF No. 124, 02:03:00 to 02:04:00).

## VI.   DISCUSSION

Mr. Kenneth W. Hill, an experienced real estate developer and investor, credibly testified during the evidentiary hearing on the Motion for relief from stay.  Mr. Hill did not dispute that the Debtors have no employees, little or no cash, no revenue or income, *de minimis* unsecured debt, and made no post-petition debt service payments to the sole secured creditor.

### a.  The Disclosure Statement Discloses an Unconfirmable Plan

As noted, the Debtors admitted during the evidentiary hearing their Chapter 11 Plan of Reorganization is unconfirmable as a matter of law.  The Debtors propose to pay Stormfield's secured claim totaling approximately $4,000,000 at some point in the future, possibly with a lump sum payment of just $2,500,000, at the Debtors' sole option. Without Stormfield's consent, such a plan is unconfirmable.  As discussed below, this treatment for Class 3 Claims (consisting of just Stormfield's claim) cannot satisfy the requirements of Bankruptcy Code §§ 1129(a) and (b).

Even without the option to pay the discounted amount of $2,500,000, the plan is not confirmable.  The Disclosure Statement makes clear the payment of the secured claim would come through future revenue generated by as-yet-unfinished apartment

units, eventually.  The Debtors do not commit to a firm timetable for when payments would begin which is understandable since construction funding is not firmly lined up. Assuming everything went the Debtors' way during construction, the 201 Winchester property could not commence making interest payments or debt service payments for at least another nine to twelve (9 to 12) months.  No adequate protection for Stormfield has been proposed.  Importantly, most of the funding sources identified by Mr. Hill are speculative, including an inheritance he might obtain through the cooperation of his several siblings and an uncertain refinance payout from a building unrelated to this bankruptcy estate.

The Debtor's Disclosure Statement makes no mention of the financial mechanism for the completion of Phase 3 of the Debtors' Plan, perhaps because the construction of a new building on the 235 Winchester property is speculative and in the distant future (*i.e.,* after 201 Winchester is completed, leased out, and refinanced). During the evidentiary hearing, Mr. Hill testified the completion of construction for a residential building on the 235 Winchester property would require at least $2,000,000, but the financing for that project requires completion of the 201 Winchester renovations and a new loan from a new lender.

Stormfield vowed it will not consent to this treatment of its secured claim and will object to the confirmation of the Plan.  This leaves the Debtors without an impaired accepting class of creditors.  This claim treatment fails to meet the requirements of Bankruptcy Code §§ 1129(a)(8), (a)(10), (a)(11) or (b)(1).

Importantly, the Chapter 11 Plan fails to provide adequate protection to Stormfield's secured claim.  Stormfield is expected to stand aside for months or years

while the Debtor tries to complete the 201 Winchester building, and perhaps accept a payment of $2,500,000 for its claim totaling over $4,000,000.  Even if the appraiser's present-day valuation of the Properties were accurate—which the court did not find entirely credible due to the differences between comparable properties and the Debtors' Properties, among other reasons—the Chapter 11 Plan fails to provide adequate protection of the Stormfield secured claim through an equity cushion.

Because the Disclosure Statement describes a Chapter 11 Plan the Debtors admit is unconfirmable as a matter of law, the Disclosure Statement will be disapproved.

### b.  The Secured Creditor is Entitled to Relief from Stay Pursuant to 11 U.S.C. § 362(d)(1)

Stormfield argues it is entitled to relief from stay for cause, pursuant to Bankruptcy Code § 362(d)(1), because it lacks adequate protection of its interest in the Properties and because the Debtors' cases meet the eight indicia for a bad faith filing.

### i.  The Secured Claim is Not Adequately Protected

Based on the well-developed record here, Stormfield met its burden to establish its interest in the Properties is not adequately protected.  The Debtors introduced testimony from an expert witness appraiser valuing the Properties at $3,450,000 in January 2024.  Given Stormfield's debt exceeds $4,000,000, the Debtors have no equity in the Properties.

Neither 201 Winchester nor 235 Winchester is currently producing revenue or income.  Post-petition, the Debtors made neither adequate protection payments to Stormfield nor real property tax payments to the City of New Haven.  The Debtors depend on contributions from Mr. Hill to maintain liability insurance or to make any payments at all.  Stormfield's debt established in Spring 2023 by the 2023 Foreclosure

Judgment, shortly before the Petition Date, far exceeds the Debtors' own valuation evidence for the Properties.  On this record, there is no conclusion the court can make other than that the movant Stormfield's interest is not adequately protected.

### ii.  The Chapter 11 Cases Meet All Eight Factors for Bad Faith

The Circuit Court instructs courts, including this one, to consider eight factors when determining whether a case is filed in bad faith.

First, here the Debtors have only one asset burdened by one debt: the Properties encumbered by a blanket mortgage debt held by Stormfield.  Second, the Debtors have only one unsecured creditor whose claim is *de minimis* (less than $5,000) or exceedingly small in relation to Stormfield's secured claim in excess of $4,000,000. Third, the Debtors' only assets are the subject of a foreclosure action as a result of arrearages or default on the debt.  Fourth, the Debtors' financial condition is, in essence, a two-party dispute between the Debtors and Stormfield which can be resolved in the pending state foreclosure action.  Fifth, the timing of the Debtors' filing evidences, at a minimum, an intent to delay Stormfield's enforcement of its non-bankruptcy law rights as a creditor.  Sixth, the Debtors have no cash flow, and the mortgaged property generates no revenue.  Seventh, the Debtors cannot pay current expenses, including the payment of real estate taxes, without capital contributions or donations from the equity owner.  And, eighth, the Debtors have no employees.  *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1310.

Each of these eight factors supports a conclusion the bankruptcy filing was in bad faith.  While the record demonstrates the Debtors took steps in attempt to

reorganize, their efforts are insufficient to demonstrate good faith in light of the underlying facts.

Because a lack of adequate protection and a bad faith filing are each an independent basis to conclude there is "cause" to grant relief from stay, the Motion will be granted pursuant to § 362(d)(1).

### c. The Secured Creditor is Entitled to Relief from Stay Pursuant to 11 U.S.C. § 362(d)(2)

#### i. There is No Equity in the Property

Stormfield met its burden to establish the Debtors have no equity in the Properties. *See,* 11 U.S.C. § 362(g). Both the 2023 Foreclosure Judgment and the Debtors' own real estate appraisal evidence reflect a present value significantly less than the debt. The court need not belabor the significant difference between the two sets of appraisal figures (2023 vs. 2024) because even the Debtors' higher 2024 appraisals valued the Properties at a figure several hundred thousand dollars below the allowed secured claim. As a result, Stormfield met its burden to show the Debtors have no equity in the Properties, and the burden shifted to the Debtors to establish the Properties are necessary to an effective reorganization.[8]

#### ii. No Effective Reorganization is Proposed

To meet their burden to show there is an effective reorganization in the offing, the Debtors needed to present evidence that their Chapter 11 Plan had a reasonable probability of being confirmed in a reasonable period of time. Mr. Hill testified at length

---

[8] The court leaves for the parties the appropriate resolution of the valuation differences between the state court judgment in early 2023 compared to the appraisal evidence submitted to this court in early 2024.

about the difficult obstacles he faced over more than a decade in his quest to develop the Properties.  As noted, the present mortgage debt on the Properties was incurred in March 2020, at the dawn of the COVID-19 pandemic.  As the court and the parties are well aware, the consequences of COVID-19 included great uncertainty about government processes, closure of public and private offices, interest rate changes, and inflation.

Now, the Debtors hope to assemble financing for construction to complete the renovation of 201 Winchester from a variety of sources but three years after the Loan matured (and nine months after the cases commenced) they have yet to do so.  Much of the testimony about the Debtors' Plan was lacking in detail and not included in the Disclosure Statement.  For example, testimony about a potential inheritance held in an account left by Mr. Hill's parents, possibly soon subject to Louisiana escheat provisions, was vague as to the process to obtain the funds and whether any obstacles to obtaining them might intervene.  Since the funds have apparently languished for approximately a decade in an account in Louisiana, despite the Debtors' 2021 loan default and their dire need of funding to complete construction or renovation of, at least, the 201 Winchester property, the court discounts this as a source of possible funding for an effective reorganization here.  The time to have figured out how to get the inheritance was long before the filing of these cases, or after filing these cases and before filing the Disclosure Statement (which is silent as to this source of funding).

Similarly, the court discounts the $300,000 to $600,000 expected from a refinance of the Olive Street property owned by Mr. Hill's wife.  No evidence substantiating the Olive Street refinance was presented.  While the court credits Mr.

Hill's testimony that his wife intends to contribute her money to help the Debtors renovate 201 Winchester, no corroborating evidence about the amount or timing of the contribution was introduced.  For example, Mr. Hill testified his wife had stated in a letter she would contribute funds, but the letter was not admitted into evidence, and she did not testify.

Mr. Hill identified four other sources of relatively immediate funds: (1) supplier lines of credit he would be able to access through other businesses he is affiliated with that would provide materials and supplies valued at approximately $50,000; (2) another $50,000 of credit from Mr. Hill's personal credit cards; (3) a line of credit Mr. Hill and his wife have access to with availability of approximately $70,000 to $80,000; and (4) $200,000 held in an account owned by another of Mr. Hill's businesses.  While the court assumes these amounts would be available to the Debtors in a relatively short time period, little or no detail was provided about whether the Debtors would have to repay these sums as loans, whether these amounts would be capital contributions, or when these amounts would be available to the Debtors.

The March 5th and 7th evidentiary hearing was scheduled many weeks ago and these Chapter 11 cases have been pending since June 2023.  Given this timing, the Debtors were to put together evidence that the Properties can be effectively reorganized.  The evidence presented does not persuade the court that the expected funds will be available in a reasonable period of time.  To the contrary, several of the sources of funding were mentioned for the first time on March 7th.  Taken together, if all these sources of funds were available to the Debtors, it is possible they might be able to

complete the renovations of the 201 Winchester property.  However, substantial portions of the funding are speculative based on the current record.

The Debtors are not on the verge of completing the construction project and they have not grappled with the obligation to pay even minimal costs – real property taxes, insurance, adequate protection – during the many months after a hypothetical confirmation of their plan before they can renovate and rent out all of the 201 Winchester apartments.  On this record, the court must conclude the Debtors failed to meet their burden to show there is an effective reorganization prospect at this time.

## VII.    **CONCLUSION**

For these reasons the Debtors' First Amended Disclosure Statement, ECF No. 101, is disapproved and a separate order will enter.

Stormfield's Motion for Relief from Stay, ECF No. 68, will be granted pursuant to §§ 362(d)(1) and (d)(2), and a separate order granting relief from stay will enter.

All other arguments made were considered and determined to be without merit.

This Memorandum of Decision and the separate orders to enter constitute final orders subject to rights of appeal.  The time within which a party may file an appeal of a final order of the bankruptcy court is fourteen (14) days after it is entered on the docket. *See*, Fed.R.Bankr.P. 8001, *et seq*., Fed.R.Bankr.P. 8002(a)(1); *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S.Ct. 582 (2020); *see*, Fed.R.Bankr.P. 7008, 7012(b).

Dated this 21st day of March, 2024, at New Haven, Connecticut.



Ann M. Nevins
Chief United States Bankruptcy Judge
District of Connecticut